**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**THOMAS W. VANES**
Crown Point, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DARYL K. HENDERSON, JR., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A03-1401-CR-34 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Thomas P. Stefaniak, Jr., Judge
Cause No. 45G04-1208-MR-11

**October 9, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

Appellant-Defendant, Daryl K. Henderson (Henderson), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1.

We affirm.

## ISSUE

Henderson raises one issue on appeal which we restate as follows: Whether the trial court abused its discretion in refusing to tender jury instructions on voluntary manslaughter.

## FACTS AND PROCEDURAL HISTORY

On August 2, 2012, Henderson spent his afternoon drinking alcohol at his home in Gary, Indiana. At around 4:00 p.m., Henderson decided to drive to Rico's Pizza to get pizza for his family. At the time, Henderson's driver's license had been suspended. Henderson also carried a small handgun on his person despite the fact that his permit to carry a handgun had since expired. While driving to Rico's Pizza, Henderson was drinking from a can of beer. When he arrived at Rico's Pizza, Henderson entered the restaurant holding his can of beer and placed his order. While waiting for his order, he bumped into Lawrence McIntosh (McIntosh), with whom he had no prior acquaintance. They engaged in small talk when Henderson stated that he wanted to buy alcohol, and McIntosh informed Henderson that there was a liquor store next door. Shortly thereafter, both men exited Rico's Pizza and entered Party Liquors. As they walked in, the cashier at Party Liquors told Henderson that he could not serve him if he had an open can of beer. Henderson turned

around, walked out, placed his empty can of beer on the pavement, and walked back in. While Henderson was outside tossing his can of beer, McIntosh told the cashier that he wished Henderson would leave him alone. Henderson reentered Party Liquors, but since the cashier refused to sell him alcohol, he requested McIntosh to purchase alcohol on his behalf. The Party Liquors' surveillance video showed McIntosh paying for what looked like a six-pack of beer and leaving Henderson inside the liquor store. It further showed McIntosh walking to his car, dropping off his six-pack of beer, and going back into Rico's Pizza. Also, it showed Henderson leaving Party Liquors and returning to Rico's Pizza to pick up his pizza.

After Henderson picked up his pizza, he saw McIntosh on his way out. Henderson approached McIntosh, and both men talked briefly. A short while later, Henderson returned to Rico's Pizza to get a drink. When Henderson saw McIntosh seated inside the restaurant, he approached McIntosh and started circling him while making threatening hand gestures. That provoked McIntosh and prompted him to stand up to face Henderson At that point, Henderson told McIntosh, "You want to act like you don't know me? . . . I got something for your ass when you come outside." (Transcript p. 153). McIntosh responded that he was tired of Henderson's "shit" and he told him to leave him alone and get his own beers. (Tr. p. 208). McIntosh then punched Henderson and a scuffle ensued. The fight did not last long because both men were ordered to go outside. Prior to the altercation, McIntosh had removed his t-shirt, but upon exiting Rico's Pizza, he began to put it back on. As soon as both men were outside, Henderson retrieved his handgun from

3

his pocket, aimed it at McIntosh, and fired one shot at close range. Henderson fired two more shots at McIntosh as he was running away from him. Firing the shots, Henderson told McIntosh, "I told you I was gonna do this." (Tr. p. 237). McIntosh was hit twice: in his jaw and chest, with the chest wound causing his death. Meanwhile, Henderson ran toward his vehicle, fired two more random shots, and reloaded his gun.

A police officer who was on patrol in the nearby area heard the gunshots and drove toward the direction of the shots. When he arrived at Rico's Pizza, he saw people pointing toward Henderson's vehicle and he immediately activated his emergency lights. Upon seeing the officer, Henderson fired one more shot in the officer's direction and fled from the scene. A high speed chase through the city ensued. Henderson's vehicle eventually came to a stop when it hit a stop sign. Henderson attempted to flee on foot and hid behind some bushes but was quickly apprehended by the officers. Although he resisted arrest, the officers were able to subdue him. Upon searching Henderson's vehicle, the officers found a small handgun on the floorboard. Because Henderson complained of injuries, he was taken to the hospital, for treatment. Henderson became unruly at that hospital and he had to be restrained. The following day, Gary police detectives interviewed Henderson after advising him of his *Miranda* rights. Henderson narrated four different versions of the events leading to the shooting.

On August 4, 2012, the State filed an Information charging Henderson with one Count of murder, and one Count of resisting law enforcement, a Class D Felony. However, on November 8, 2012, and subsequently on October 16, 2013, the State amended the

4

Information to reflect the following charges: Count III, criminal recklessness, a Class D felony; Count IV, resisting law enforcement, a Class A misdemeanor; Count V, resisting law enforcement, a Class A misdemeanor; Count VI, carrying a handgun without a license, a Class A misdemeanor; Count VII, driving while suspended, a Class A misdemeanor; Count VIII, no valid driver's license, a Class C infraction; Count IX, speeding, a Class C infraction; Counts X-XXVI, disregarding automatic signals and disregarding stop signs, all Class C infractions.

Henderson's jury trial was conducted on November 18, 2013 through November 22, 2013. At trial, Henderson testified that he only shot at McIntosh in self-defense because he believed that McIntosh was reaching for something inside his shirt, and he feared for his life. Toward the end of the trial, Henderson tendered jury instructions on voluntary manslaughter and reckless homicide. The trial court declined to tender the voluntary manslaughter instruction but tendered the reckless homicide instruction. At the close of the evidence, the jury found Henderson guilty of murder and all other Counts except for one Count of criminal recklessness, a Class D felony; one Count of resisting law enforcement, a Class A misdemeanor; and three of the traffic infractions.

On December 19, 2013, the trial court held Henderson's sentencing hearing and sentenced Henderson to consecutive sentences of fifty-three years for the murder conviction, and fourteen months for one Count of resisting law enforcement, a Class D felony. In addition, the trial court sentenced Henderson to concurrent sentences of nine months each for one Count of resisting law enforcement, a Class A misdemeanor, and one

5

Count for carrying a handgun without a license, a Class A misdemeanor. Henderson also received a ninety-day sentence in the Lake County Jail for driving while suspended.

Henderson now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Voluntary Manslaughter Instruction*

Henderson argues that the trial court abused its discretion when it denied his proposed jury instruction offering voluntary manslaughter as a lesser included offense to the murder charge. In response to Henderson's claim, the State argues that the trial court correctly determined that evidence did not support the instruction because there was no appreciable evidence of sudden heat.

The manner of instructing a jury lies largely within the sound discretion of the trial court, and we review only for an abuse of that discretion. *Emerson v. State,* 724 N.E.2d 605, 608 (Ind. 2000); *Stringer v. State*, 853 N.E.2d 543, 548 (Ind. Ct. App. 2006). An abuse of the trial court's discretion occurs "when 'the instructions as a whole mislead the jury as to the law in the case.'" *Ham v. State*, 826 N.E.2d 640, 641 (Ind. 2005) (quoting *Carter v. State*, 766 N.E.2d 377, 382 (Ind. 2002)). A defendant is only entitled to a reversal if he affirmatively demonstrates that the instructional error prejudiced his substantial rights. *Hero v. State*, 765 N.E.2d 599, 602 (Ind. Ct. App. 2002), *trans. denied.*

A trial court must engage in a three-step analysis when determining whether to instruct a jury on a lesser included offense of the crime charged. *Wright v. State*, 658 N.E.2d 563, 566-67 (Ind. 1995). First, the trial court must consider whether the alleged

6

lesser included offense is an inherently included offense to the principal charge. *Id.* If it is not, the trial court must then decide whether the alleged lesser included offense is a factually included offense to the principal charge. *Id.* at 567. Finally, if the alleged lesser included offense is either an inherently or factually included offense to the principal charge, then the trial court must determine if there is a serious evidentiary dispute regarding the element that distinguishes the lesser offense from the principal charge. *Id.* If such a dispute is present and a jury could conclude that the lesser offense was committed but not the principal charge, then it is a reversible error for the trial court to refuse to give the jury instructions on the lesser included offense. *Id.*

A person commits murder when the person "knowingly or intentionally kills another human being." I.C. § 35-42-1-1. On the other hand, a person commits voluntary manslaughter when the person knowingly or intentionally kills another human being "while acting under sudden heat." I.C. § 35-42-1-3(a). Sudden heat is characterized as "anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection." *Dearman v. State*, 743 N.E.2d 757, 760 (Ind. 2001). Sudden heat is not an element of voluntary manslaughter. *See Boesch v. State*, 778 N.E.2d 1276, 1279 (Ind. 2002). Rather, it is that which distinguishes voluntary manslaughter from murder. *Id.* Although voluntary manslaughter is a lesser-included offense of murder, it is an atypical example of a lesser-included offense. *Watts v. State*, 885 N.E.2d 1228, 1231 (Ind. 2008). "In the case of voluntary manslaughter . . . sudden heat is a mitigating factor, not an element

7

that the State must prove in addition to the elements of murder . . . [I]f there is no serious evidentiary dispute over sudden heat, it is error for a trial court to instruct a jury on voluntary manslaughter in addition to murder." *Id*. at 1232.

At trial, Henderson tendered a written instruction regarding voluntary manslaughter and reckless homicide as a lesser included offense of murder. The trial court instructed the jury on murder and reckless homicide but refused to instruct it on voluntary manslaughter after finding there was "no serious evidentiary dispute as to whether or not [Henderson] acted under sudden heat." (Tr. p. 758). Henderson, however, claims that there was a serious evidentiary dispute as to whether there was sudden heat. Specifically, Henderson argues that he acted under sudden heat because he was in a state of *fear* after McIntosh punched him. We reject Henderson's argument and also find his reliance on *Clark v. State*, 834 N.E.2d 153, 159 (Ind. Ct. App. 2005), *trans. denied*, to support his theory of *fear*, misplaced. In *Clark*, two brothers exchanged words with Clark and then attempted to take Clark's bag. *Id*. at 154-55. During the altercation, Clark stabbed one of the brothers, walked to a nearby shelter, dropped his knife, and stated that he had just stabbed someone who tried to rob him. *Id*. At trial, Clark testified that the victim kept coming towards him even though he repeatedly told the victim to stop, and that he was fearful that the victim was going to pull out a gun and shoot him. *Id*. On appeal, this court reversed Clark's conviction and remanded the case because there was serious evidentiary dispute that Clark killed the victim under sudden heat, therefore he was entitled to a voluntary manslaughter instruction. *Id*. at 159.

Turning to the record, we find nothing comparable about Henderson's case. Henderson met McIntosh for the first time at Rico's Pizza on the day of the shooting. For the most part, McIntosh was pleasant to Henderson even though Henderson nagged and irritated him. When Henderson accosted McIntosh for ignoring him, McIntosh was forced to stand up and defend himself. Angered by Henderson's actions of circling him, McIntosh punched Henderson and the two men became embroiled in a scuffle. Witnesses at Rico's Pizza testified that, for the most part, Henderson kept charging at McIntosh, and had to hold back Henderson from charging at McIntosh. When both men were ordered to leave, McIntosh was first to exit, followed by Henderson. While at the door, one of Rico's employees put his arm up to stop Henderson from walking out. Henderson, however, resisted and left Rico's Pizza. Once outside, the fist fight quickly degenerated into a gun battle. McIntosh was in the process of pulling his t-shirt back on, when Henderson raised his gun and shot him. McIntosh started running away, but Henderson quickly followed McIntosh and fired two more shots at him. As he fired the shots, Henderson told McIntosh, "I told you I was gonna do this." (Tr. p. 237). Henderson then walked to his vehicle and reloaded his gun. When the officer arrived at the scene, Henderson fired one more shot in the officer's direction and fled the scene.

Unlike *Clark*, there was no appreciable evidence that Henderson acted under sudden heat because there is no evidence that Henderson was in fear of McIntosh. Though the shooting occurred immediately after McIntosh punched him, Henderson was not acting in fear, but had the sole intention of killing McIntosh. The record reveals that when he first

confronted McIntosh at Rico's Pizza, Henderson told McIntosh, "I got something for your ass when you come outside." (Tr. p. 153). In addition, Henderson admitted at trial that he retrieved his gun even before he exited Rico's Pizza. Instead of continuing with the fist fight, he fired several shots at McIntosh who was attempting retreat.

Based on the totality of the evidence, we find that nothing in this case illustrates any possibility of the existence of sudden heat. As we noted in the foregoing, sudden heat is characterized as ". . . *terror* sufficient to obscure the reason of an ordinary person . . ." *Dearman*, 743 N.E.2d at 760 (emphasis added). In this regard, we conclude that there was no serious evidentiary dispute regarding whether Henderson killed McIntosh while acting in sudden heat. Clearly, the impetus to kill did not just suddenly overwhelm Henderson, instead his actions were clearly contemplated and not driven by "fear." Accordingly, the trial court did not abuse its discretion in declining to give Henderson's proposed instruction on voluntary manslaughter. *See Collins v. State*, 873 N.E.2d 149, 160 (Ind. Ct. App. 2007), *trans. denied*. Therefore, we affirm Henderson's murder conviction.

## CONCLUSION

Based on the foregoing, we find that the trial court properly declined to instruct the jury on voluntary manslaughter.

Affirmed.

MATHIAS, J. and CRONE, J. concur